UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| CASSIE SPENCER,<br><br>        Plaintiff,<br><br>v.<br><br>KANE COUNTY, a political division of the State of Utah,<br><br>        Defendant. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 2:21-CV-00512-TS-CMR<br><br>Judge Ted Stewart<br>Magistrate Judge Cecilia M. Romero |

This matter is before the Court on Defendant Kane County's Motion for Summary Judgment.[1] For the reasons stated herein, the Court will grant the Motion.

I. BACKGROUND

Plaintiff Cassie Spencer filed her Complaint against Defendant Kane County on August 30, 2021. On December 11, 2022, Defendant filed the Motion for Summary Judgment now before the Court. Plaintiff did not respond to Defendant's Motion and Defendant filed a Request to Submit for Decision on April 27, 2023. Because Plaintiff failed to respond to the Motion, all facts asserted therein are deemed admitted for purposes of resolving the Motion.[2] The facts relevant to the Motion are as follows.

---

[1] Docket No. 24.

[2] Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . .").

A. *Sexual Harassment Allegations*

From December 2016 to July 2019, Defendant Kane County employed Plaintiff Cassie Spencer as a Corrections Deputy.[3] Plaintiff reported numerous instances of sexual harassment between 2017 and 2019.[4] These alleged incidents, as described in the Complaint, include the following:[5]

- On or about November 26, 2017, Deputy Banks interrupted Plaintiff while she was speaking to an inmate. Later, in front of their peers, Banks commented that the interruption was due to him wanting to prevent the inmate from flirting with Plaintiff.[6]

- On or about February 18, 2018, Banks gave Plaintiff a book as a gift. Deputy Stovall, "condescendingly asked [Plaintiff] about the book with intent to make her feel uncomfortable" and warned Plaintiff to let him know if Banks "touche[d] [her] or anything."[7]

- In March 2018, Banks commented that Plaintiff would look nice in red while observing her shopping online for a dress to wear to a wedding. He also commented that she should remember not to "look better than the bride."[8]

- In March/April 2018, Banks made frequent comments about Plaintiff's appearance and placed himself in situations that would require Plaintiff to get physically close to him.[9]

- On or about July 3, 2018, Plaintiff delivered a wheelchair to Cpl. Blake Doss and, upon returning from the errand, Banks asked, "Did you get Doss off?"[10]

---

[3] Docket No. 24 ¶¶ 1, 34.

[4] *Id.* ¶ 3.

[5] Defendant's asserted undisputed facts do not contradict the following allegations contained in the Complaint.

[6] Docket No. 2 ¶ 12.

[7] *Id.* ¶ 15.

[8] *Id.* ¶ 16.

[9] *Id.* ¶ 17.

[10] *Id.* ¶ 19.

- Sometime between July and August, 2018, Banks rubbed Plaintiff's back while she was bent over a chair in pain and commented that "it's going to be okay." Another officer—Deputy Stovall—later commented on the interaction telling her that Banks was thinking "I'm six inches from her butt!" This "joke" was repeated several times to multiple deputies.[11]

- Sometime between July and August 2018, Stovall made another "joke" suggesting Banks was waiting outside Plaintiff's home in his vehicle and she would find "tissues" all over her lawn. He further joked that Banks was digging a hole in his backyard in which to put Plaintiff.[12]

- On December 8, 2018, Stovall showed Plaintiff a video of Banks thrusting his crotch toward a counter. Stovall and Cram told her that, as he was doing so, deputies were discussing her "ass" and the pants she was wearing on a previous occasion. They also warned her she "may want to be careful" what she wears around Banks.[13]

- Around the same time, Deputies Spencer and Cram made numerous comments about Banks liking, looking at, or talking about Plaintiff's "ass."[14]

- Following several of these incidents, Plaintiff alleges she reported the incident and it was brushed off as "weird" or "harmless," or that Banks was "socially awkward."[15]

- On or about March 6, 2019, upon arriving at work, Plaintiff overheard Deputy Anderson state, "Oh great, now we all have to walk on eggshells."[16]

B. *Internal Investigation*

On February 21, 2019, Plaintiff told Doss that Banks had been sexually harassing her at work and nothing had been done about it.[17] On February 21, 2019, Doss relayed Plaintiff's

---

[11] *Id.* ¶¶ 21–22.

[12] *Id.* ¶¶ 23–25.

[13] *Id.* ¶ 26.

[14] *Id.* ¶¶ 27–31.

[15] *Id.* ¶¶ 18, 20, 31, 32.

[16] *Id.* ¶ 35.

[17] Docket No. 24 ¶ 6.


complaint to Lieutenant Mason Keller.[18] Keller and Plaintiff met shortly after to discuss Plaintiff's report.[19] After that meeting, Keller attempted to follow up with Plaintiff to obtain more information, but Plaintiff did not respond.[20]

On February 28, 2019, Sheriff Tracy Glover ("Glover") became aware of Plaintiff's sexual harassment complaint and directed Detective Dan Watson ("Watson") to investigate Plaintiff's claims.[21] During Watson's investigation, he interviewed sixteen people, including Plaintiff.[22] On March 1, 2019, Watson interviewed Plaintiff regarding her allegations. According to Plaintiff's Complaint, Watson "had no intent of investigating" her complaints and had falsely accused her of smoking marijuana and sleeping with married men a month prior.[23] On March 7, 2019, Watson interviewed Spencer for the second time. Plaintiff's Complaint alleges she felt Watson had attempted to make her feel like the harassment was her fault.[24]

Watson's investigation found that Banks violated the Sheriff's Office policy on discourteous treatment; that certain members of leadership knew or should have known that Stovall and Cram had violated the sexual harassment policy; that Keller failed to follow up on, investigate, or document Plaintiff's evaluation report; that Stovall and Cram's conduct towards Plaintiff and Banks violated parts of the sexual harassment and conduct policies; and that Plaintiff's insubordination, unpredictable emotions, and mood swings could adversely affect the

---

[18] *Id.* ¶ 7.
[19] *Id.* ¶ 8.
[20] *Id.* ¶¶ 10–12.
[21] *Id.* ¶ 13.
[22] Docket No. 24-7, at 2.
[23] Docket No. 2 ¶ 34.
[24] *Id.* ¶ 36.

exercise of her duties and the safety of officers at the Kane County Jail.[25] Chief Deputy Allan Alldredge reviewed Watson's report and recommended specific corrective action to take in response, which was implemented.[26]

    C. *Plaintiff's Termination*

Sheriff's Office Policy 1012 details the requirements for a deputy at Kane County Jail to be fit for duty, including "free[dom] from any physical, emotional, or mental condition which might adversely affect the exercise of peace officer powers," as well as the ability to "perform his/her respective duties without physical, emotional and/or mental constraints."[27] In March 2019, the Sheriff's Office received several reports purporting Plaintiff exhibited behavioral and emotional issues that could have affected her fitness for duty, including that Plaintiff: missed two mandatory trainings; reported "migraines, stomach pains, and a level of anxiety so high it had made her 'physically sick and not able to function;'" experienced several emotional breakdowns where she "cried uncontrollably" and either needed to take a break or go home for the day in order to "gather her emotions;" and exhibited "insubordination," "unpredictable emotions and mood swings," which the reporting officer felt "could directly affect officer safety at the Kane County Jail."[28]

On March 21, 2019, Keller informed Plaintiff that "due to the significant behavioral and emotional issues she had exhibited," she was being placed on paid administrative leave until she

---

[25] Docket No. 24 ¶ 15.

[26] *Id.* ¶¶ 16–20.

[27] *Id.* ¶ 21.

[28] *Id.* ¶ 22.

received a fitness-for-duty evaluation.[29] In April 2019, Dr. Brian Partridge ("Partridge"), a licensed psychologist conducted Plaintiff's psychological evaluation. On April 23, 2019, Partridge informed Keller that he determined Plaintiff was not fit for duty. Specifically, he concluded, among other things, that:

> a. Her symptoms and anxiety negatively affected her physical functioning, neurocognitive abilities, and attitude toward herself and could interrupt her working relationships, confidence, and decision-making ability.
>
> b. Lack of stress management and coping methods left her overwhelmed and emotional and she was a potential risk to herself, colleagues, and public safety.
>
> c. Mental health treatment, psychotropic medication, and intervention might help, and she could learn coping methods, stress management, and self-care skills.
>
> d. Her reluctance for medication, reservations on counseling, and external attribution for her anxiety, would make it challenging to complete a therapeutic course.[30]

Plaintiff was notified of Dr. Partridge's determination and that she had been approved for twelve weeks of leave under the Family Medical Leave Act ("FMLA") in hopes she could improve and become fit for duty.[31] When her FMLA leave was coming to an end, Plaintiff was required to provide a Fitness for Duty Certification signed by her medical provider and receive a follow-up evaluation with Dr. Partridge before she could return to work.[32] Both Plaintiff's doctor and Dr. Partridge found Plaintiff was still not fit to return to work.[33] Plaintiff was

---

[29] *Id.* ¶ 25.

[30] *Id.* ¶ 29.

[31] *Id.* ¶ 30.

[32] *Id.* ¶ 31.

[33] *Id.* ¶¶ 32–33.

informed on July 27, 2019, that her FMLA leave had run out and, because she remained unfit for work, her employment was terminated.[34]

On December 30, 2019, Plaintiff submitted a charge of discrimination to the Utah Anti-Discrimination & Labor Division ("UALD") and Equal Employment Opportunity Commission ("EEOC") alleging retaliation and discrimination based on sex and disability.[35] On June 26, 2020, the UALD issued a Determination and Order finding Plaintiff failed to establish that she was subjected to sexual harassment, discrimination, or unlawful retaliation.[36]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[37] In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[38] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[39] This standard is somewhat modified in an unopposed motion for summary judgment. As a preliminary note, it is improper for the Court to grant

---

[34] *Id.* ¶ 34.

[35] *Id.* ¶ 35.

[36] *Id.* ¶ 36.

[37] Fed. R. Civ. P. 56(a).

[38] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[39] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

summary judgment simply because it is unopposed.[40] Instead, the Court must "examin[e] the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law."[41] In doing so, the Court may consider any properly stated facts as "undisputed for purposes of the motion."[42]

### III. DISCUSSION

Defendant moves for summary judgment on each of Plaintiff's claims brought under Title VII of the Civil Rights Act of 1964: (1) sex-based harassment; (2) sex-based discrimination, and (3) retaliation. For the reasons described herein, the Court will grant the Motion.

*A. Sex-based Harassment Hostile Work Environment Claim*

Defendant first alleges that Plaintiff's hostile work environment claim must be dismissed as untimely. Title VII requires a plaintiff to file a charge of discrimination within 300 days "after the alleged unlawful employment practice occurred."[43] Plaintiff filed a charge of discrimination on December 30, 2019.[44] Accordingly, any allegations occurring before March 5, 2019, fall outside of the timeliness window. However, the Supreme Court has held that because "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute 'one unlawful employment practice,'"[45] "consideration of the entire scope of a hostile work

---

[40] *See Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002); *United States v. Dawes*, 344 F. Supp. 2d 715, 718 (D. Kan. 2004); DUCivR 56-1(f).

[41] *Reed*, 312 F.3d at 1195.

[42] *See* Fed. R. Civ. P. 56(e)(2).

[43] 42 U.S.C. § 2000e–5(e)(1).

[44] Docket No. 24-28.

[45] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)).

environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."[46] To determine whether untimely acts may be considered as part of the acts supporting a timely hostile environment allegation, courts look to "the type of the[] acts, the frequency of the acts, and the perpetrator of the acts."[47]

In *Hansen v. SkyWest Airlines*,[48] the Tenth Circuit found alleged harassing acts were part of the same hostile work environment claim where the plaintiff alleged "the same type of sexual harassment (sexual propositions and unwelcome physical contact) over a period of eight years total," and "identified two primary harassers."[49] Conversely, in *Duncan v. Manager*, the Tenth Circuit found that the acts were not sufficiently related where the untimely actions involved "threatening physical and psychological harassment" and the timely acts "involve[d] off-color comments and rumor-spreading perpetrated by a completely different set of actors."[50] Moreover, the acts had taken place over 18 years.

Here, while the events at issue occurred within a shorter time frame, the facts presented are more akin to *Duncan*. The untimely acts involved repeated sexual innuendos, sex-based jokes and comments, and unwelcome physical touch and proximity, primarily perpetrated by Stovall, Cram, and Banks. This harassing conduct occurred frequently between November 2017 and December 2018. The timely allegations contained in the Complaint supporting Plaintiff's hostile

---

[46] *Id.* at 105.

[47] *Duncan v. Manager, Dep't of Safety, City & Cnty. Of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005) (citing *Morgan*, 536 U.S. at 120).

[48] 844 F.3d 914 (10th Cir. 2016).

[49] *Id.* at 924.

[50] *Duncan*, 397 F.3d at 1309.

work environment claim are (1) that Deputy Anderson commented that he would have to "walk on eggshells" after seeing Plaintiff at their workplace, and (2) that Watson attempted to make her feel like the harassing conduct was her fault during their second interview. Unlike the untimely allegations, the timely allegations involve only one or two isolated incidents by each perpetrator. Further, the timely allegations involve different perpetrators and a different type of conduct than the untimely conduct. Thus, the "pre- and post-limitations" acts cannot constitute "the same actionable hostile work environment practice."[51] The Court accordingly will consider only the two timely acts Plaintiff alleges in support of her hostile work environment claim.

"For a hostile environment claim to survive a summary judgment motion, 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[52] Title VII is not "a general civility code for the American workplace."[53] To that end, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."[54]

Based on the undisputed facts, a reasonable jury could not find that the two timely incidents described above are sufficiently severe and pervasive such that a reasonable person

---

[51] *Morgan*, 536 U.S. at 120.

[52] *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (quoting *Davis v. U.S. Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998)).

[53] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

[54] *Id.* at 81 (internal quotation marks and citation omitted).

would find the work environment to be hostile or abusive. Therefore, the Court will dismiss Plaintiff's hostile work environment claim.

    *B. Sex-based Discrimination*

Under Title VII, it is unlawful to discriminate against any individual "because of such individual's race, color, religion, sex, or national origin."[55] "A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*."[56] In this case there is no direct evidence of discrimination, therefore, the Court will apply the *McDonnell Douglas* analysis.

> Under McDonnell Douglas, a three-step analysis requires the plaintiff first prove a prima facie case of discrimination. To set forth a prima facie case of discrimination, a plaintiff must establish that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class. The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. If the defendant does so, the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext.[57]

Defendant does not dispute that Plaintiff is a member of a protected class, based on her sex, or that she suffered an adverse employment action in that her employment was terminated. Defendant does, however, argue that Plaintiff cannot establish that she was qualified for the position, or that she was treated less favorably than others similarly situated outside the protected class.

---

[55] 42 U.S.C. § 2000e-2(a)(1).

[56] *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (citing 411 U.S. 792 (1973)).

[57] *Id.* (citations omitted).

11

First, Defendant argues Plaintiff was not qualified for her position. "The relevant inquiry at the prima facie stage is not whether an employee or potential employee is able to meet all the objective criteria adopted by the employer, but whether the employee has introduced some evidence that she possesses the objective qualifications necessary to perform the job sought."[58] "A failure to satisfy either subjective criteria, or objective qualifications 'that have no bearing on an applicant's ability to perform the job [],' cannot be used to defeat a plaintiff's prima facie case,"[59] because subjective qualifications "are more properly considered at the second stage of the *McDonnell Douglas* analysis."[60] Courts have found that a job qualification is objective when it is "generally immune to employer manipulation"[61] and can be uniformly required of and applied to all applicants and employees. For example, "an employee's education, training, and licensure" are objective standards.[62] Other qualifications, such as "interpersonal skills,"[63] or "personal behavior[,]"[64] and other qualifications that "are particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination"[65] are considered subjective and, therefore, better suited for the second stage of the *McDonnell Douglas* framework.

---

[58] *E.E.O.C. v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1193 (10th Cir. 2000) (emphasis omitted).

[59] *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1220–21 (10th Cir. 2016) (quoting *Horizon/CMS Healthcare Corp.,* 220 F.3d at 1194).

[60] *Horizon/CMS Healthcare Corp,.* 220 F.3d at 1194.

[61] *Cortez v. Wal-Mart Stores, Inc*., 460 F.3d 1268, 1273–74 (10th Cir. 2006).

[62] *Adenowo v. Denver Pub. Schs.*, No. 14-cv-02723-RM-MEH, 2017 WL 11684666, at *8 (D. Colo. Apr. 28, 2017).

[63] *Burrus v. United Tel. Co. of Kan.*, 683 F.2d 339, 342 (10th Cir. 1982).

[64] *Nguyen v. Gambro BCT, Inc*., 242 F. App'x 483, 489 (10th Cir. 2007).

[65] *Cortez*, 460 F.3d at 1274.

According to the job description of Plaintiff's position, a Corrections Deputy II is responsible for the "security, safety, order, operation[,] and maintenance of county jail facilities and the incarceration and detention of prisoners."[66] Sheriff's Office Policy 1012, Fitness for Duty, states that all deputies must "be free from any physical, emotional, or mental condition which might adversely affect the exercise of peace officer powers."[67] Defendant argues Plaintiff did not meet this objective criteria. Regardless of whether these qualifications are objective or subjective, Plaintiff has failed to meet her burden under the *McDonnell Douglas* framework.

The most compelling facts supporting that Plaintiff was unqualified for her job include that Dr. Partridge, a third-party licensed psychologist, performed a mental health evaluation and found that Plaintiff was unfit for duty and "was a potential risk to herself, colleagues, and public safety" on two different occasions due to, among other things, "her symptoms and anxiety," "lack of stress management," and resistance to standard mental health treatment options.[68] In the absence of any controverting or alternative facts regarding Plaintiff's qualification for her job, Plaintiff has failed to present evidence that she was qualified for her position.

Even if Plaintiff could establish that she was qualified for the position, her discrimination claim still fails under the third step of the *McDonnell Douglas* framework. Defendant has offered a legitimate, non-discriminatory reason for the adverse employment action. Specifically, in addition to being found unable to return to work by both a third-party licensed psychologist and Plaintiff's personal physician, the uncontroverted facts support that Plaintiff reported "migraines, stomach pains, and a level of anxiety so high it had made her 'physically sick and not able to

---

[66] Docket No. 24-30, at 2.

[67] Docket No. 24-31, at 2.

[68] Docket No. 24 ¶ 29.

function;'" experienced several emotional breakdowns where she "cried uncontrollably" and either needed to take a break or go home for the day in order to "gather her emotions;" and exhibited "insubordination," "unpredictable emotions and mood swings," which at least one reporting officer felt "could directly affect officer safety at the Kane County Jail."[69] These facts are sufficient to meet the Defendant's burden of providing a "legitimate, non-discriminatory reason" for terminating Plaintiff.

"[T]he burden then reverts to the plaintiff to show that 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief.'"[70] "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[71] In failing to respond to Defendant's asserted uncontested facts, Plaintiff has not provided any facts on which the Court could find pretext. Although Plaintiff alleges in her Complaint that Defendant fired her "because she is female,"[72] "[m]ere allegations unsupported by further evidence . . . are insufficient to survive a motion for summary judgment."[73]

---

[69] *Id.* ¶ 22.

[70] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (*quoting Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[71] *Id.* (internal quotation marks and citations omitted).

[72] Docket No. 2 ¶ 49.

[73] *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005) (citation omitted).

Plaintiff has failed to show a genuine issue of material fact as to whether she was qualified for her employment position or that the employer's proffered reason for terminating Plaintiff was pretextual. The Court will, accordingly, dismiss Plaintiff's discrimination claim.

C.  *Retaliation*

In analyzing a retaliation claim, the Court again applies the three-part *McDonnell Douglas* test discussed above. Accordingly, Plaintiff's retaliation claim fails for the same reasons discussed above—Plaintiff has not provided any facts supporting that Defendant's legitimate, non-discriminatory reason for Plaintiff's termination was pretextual. Although Plaintiff alleges in her complaint that Defendant fired her "because she complained about the workplace harassment and discrimination,"[74] these allegations, unsupported by further evidence, cannot survive summary judgment. Therefore, the Court will dismiss Plaintiff's retaliation claim.

IV. CONCLUSION

It is therefore

ORDERED that Defendant's Motion for Summary Judgment (Docket No. 24) is GRANTED.

DATED this 27th day of September, 2023.

BY THE COURT:

_____
Ted Stewart
United States District Judge

---

[74] Docket No. 2 ¶ 54.